**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kristen Westling,<br><br>          Plaintiff,<br><br>v.<br><br>Pete Hegseth,<br><br>          Defendant. | No. CV-22-00514-TUC-JGZ<br><br>**ORDER** |

Pending before the Court is Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and/or for Summary Judgment. (Doc. 67.) Plaintiff Kristen Westling, an auditor with the Defense Contract Auditing Agency ("DCAA") assigned to the Tucson Raytheon Office, brought this action against the Secretary of Defense in his official capacity, alleging claims of gender[1] and disability discrimination in employment and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and The Rehabilitation Act ("RA"). (Doc. 1 ¶¶ 1–2, 11–12; Doc. 65 ¶ 1.) The Motion is fully briefed. (Docs. 67, 76, 97.)[2] For the following reasons, the Court will grant the Motion and enter summary judgment in favor of Defendant and against Plaintiff.

---

[1] Plaintiff refers to "gender discrimination" in her Complaint, and Title VII prohibits discrimination on the basis of "sex." The Court uses the terms "sex discrimination" and "gender discrimination" interchangeably in this Order. *See, e.g.*, *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000) (explaining that "for purposes of [Title VII], the terms "sex" and "gender" have become interchangeable); *Gladden v. Procter & Gamble Distrib. LLC*, No. 19-CV-2938, 2021 WL 4930535, at *18 (N.D. Ga. July 26, 2021).

[2] No party requested oral argument, and the Court finds argument would not aid its decision. *See* LRCiv 7.2(f); Fed. R. Civ. P. 78(b).

## I.    Factual Background[3]

Plaintiff Kristen Westling is an auditor with the DCAA, an agency within the Department of Defense ("DOD") that provides audit and financial advisory services to DOD and other federal entities. (DSOF ¶¶ 1–2.) Plaintiff alleges that between August 2015 and July 2019, while assigned to the Raytheon Missiles Resident Office in Tucson, Arizona, she was subjected to 28 discriminatory and retaliatory actions[4] by supervisors and other agency employees. (DSOF ¶¶ 1, 3.) The conflict between Plaintiff and her employer culminated in a Proposed Notice of Removal for Unacceptable Performance and her reinstatement in June 2019, following administrative proceedings. (DSOF ¶¶ 3, 14.)

Plaintiff began working at DCAA in 2008. (Doc. 65-2 at 4.)[5] In a 2013 evaluation report, Plaintiff's supervisor graded her character as "Needs Improvement," and her conduct was "non-productive as in the following – abrasive, argumentative, bends the rules, lacks team commitment." (DSOF ¶ 7; PCSOF ¶ 2.) In annual performance reviews, DCAA employees are rated on "Critical Elements" on a scale of Outstanding, Exceeds

[3]  The facts below are taken from Defendant's Separate Statement of Facts in Support of Motion for Summary Judgment, (Doc. 65, "DSOF"), and Plaintiff's Controverting Statement of Facts, (Doc. 77 at 1–43, "PCSOF"), and Statement of Additional Facts, (Doc. 77 at 43–58, "PSAF"). The facts are undisputed unless otherwise specified. Where support for an asserted fact was challenged, the Court relied on the supporting documents.
    The Court notes that Plaintiff's Controverting Statement of Facts is in violation of LRCiv 56.1(b), which requires "for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph and a reference to the specific admissible portion of the record supporting the party's position if the fact is disputed." Plaintiff does not include correspondingly numbered paragraphs. (*See* Doc. 77 at 1.) Thus, when a fact in Defendant's Statement of Facts is undisputed and not addressed by Plaintiff's Controverting Statement of Facts, the Court cites to DSOF only. Otherwise, when citing to Plaintiff's Controverting Statement of Facts, the Court refers to the paragraph number listed first, rather than the DSOF paragraph number listed second.
    Additionally, "LRCiv 56.1 does not permit explanation and argument supporting the party's position to be included in the . . . statement of facts. Argument may be made in the response . . . brief . . . within the page limits." *Breeser v. Menta Grp., Inc., NFP*, 934 F. Supp. 2d 1150, 1154 (D. Ariz. 2013) (quoting *Marceau v. Int'l Broth. of Elec. Workers*, 618 F. Supp. 2d 1127, 1141 (D. Ariz. 2009)). Plaintiff's statements of fact are replete with "opinion, suggested inferences, legal arguments and conclusions." *Id.* at 1155 (citation omitted); (*see, e.g.*, PCSOF ¶¶ 2, 5, 10). Therefore, in large part, the Court "disregards the arguments, framed as disputes, which are presented in the controverting statement of facts." *See Alozie v. Ariz. Bd. of Regents*, 431 F. Supp. 3d 1100, 1105 n.2 (D. Ariz. 2020).
[4]  For simplicity and ease of reference, the Court refers to the 28 discrete actions as **Claims (a)–(bb)**, as labeled by Defendant. (*See* DSOF ¶ 3; Doc. 67 at 4 n.1; Doc. 97-3.)
[5]  Record citations refer to the page numbers generated by the Court's CM/ECF filing system.

Fully Successful, Fully Successful, Minimally Successful, and Unacceptable. (DSOF ¶ 8.) From the critical element ratings, employees receive an annual summary rating of their overall performance. (*Id.*) Between 2014 and 2017, Plaintiff never received an annual summary rating above Fully Successful. (DSOF ¶ 9.) In her 2015 annual review, Plaintiff's supervisor noted that "[a] higher level of performance can be achieved by ensuring that a positive tone is maintained for both external and internal communications/interactions." (DSOF ¶ 10.) The sequence of 28 alleged discriminatory and retaliatory acts beginning in 2015 is described below.

**Claim (a).** Plaintiff testified that Resident Auditor John Sabga denied her request to be transferred from a team supervised by Supervisory Auditor Barry Meltzer to another team on account of her gender in June or July of 2015. (DSOF ¶¶ 19, 24; PCSOF ¶ 9.)[6] Between August 2015 and October 2016, 12 DCAA employees under Sabga, 8 female (including Plaintiff) and 4 male, requested and received transfers. (DSOF ¶ 21; PCSOF ¶ 10.) Plaintiff is unaware of the reasons or justifications for any of the male employees' requested transfers. (DSOF ¶ 20.) Sabga is unaware of Plaintiff requesting a transfer prior to October 2015, and he granted Plaintiff's written transfer request in October 2015, moving her to Supervisory Auditor Kim Hehe's team. (DSOF ¶¶ 25–26, 28.) DCAA policy was to give audit staff an opportunity to request a transfer between teams once or twice per year, typically in April/May and October/November. (DSOF ¶ 27.)

**Claim (b).** Plaintiff alleges that Sabga stared at her chest during a meeting in August 2015, at which she and Sabga were the only two people present. (DSOF ¶¶ 30–31; PCSOF ¶¶ 11–12.) Sabga denies this incident occurred, and Plaintiff first complained to Ms. Hehe about the chest-staring on February 7, 2017. (DSOF ¶¶ 31–32; PCSOF ¶¶ 12–13.) HR Specialist Alfrida Coombs observed that Sabga looks awkwardly down and avoids eye contact when speaking to people, and Plaintiff acknowledged Sabga is socially awkward

---

[6] In response to DSOF ¶ 19, Plaintiff states "Undisputed in part," but does not reference a specific portion of the record supporting any dispute. (PCSOF ¶ 9); *see* LRCiv 56.1(b). Thus, the Court treats as undisputed the entire fact as stated by Defendant. *See* Fed. R. Civ. P. 56(e)(2). In future instances where Plaintiff partially disputes a fact but does not cite supporting evidence, the Court treats the entire fact stated in Defendant's statement of facts as undisputed.

and avoided eye contact with her. (DSOF ¶ 33; PCSOF ¶ 14.)

**Claim (c).** On June 18, 2015, Sabga recommended Plaintiff take a communications course, and Plaintiff agreed. (DSOF ¶ 45.) Plaintiff took and completed the course in September 2015. (DSOF ¶ 46.) Plaintiff testified she observed two male coworkers, "Matthew" and an unidentified temporary auditor, demonstrate inappropriate behavior without being sent to the communications course. (DSOF ¶ 35; PCSOF ¶ 15.) Plaintiff also testified three other female employees had communications issues but were not sent to the communications course, including Adrian Carr, who told Meltzer to "go F himself." (DSOF ¶ 36; PCSOF ¶ 16.)

Earlier in 2015, Sabga heard Plaintiff on a phone call outside his office screaming loudly at Lead Security Specialist Sandra Estrellado and calling her inappropriate names. (DSOF ¶ 38; PCSOF ¶ 18.)[7] Plaintiff subsequently sent a confrontational email to Ms. Estrellado. (DSOF ¶ 40; PCSOF ¶ 20.) Meltzer met with Plaintiff informally to discuss her performance plan and expectations for professional behavior. (DSOF ¶ 41.) At a May 13, 2015 meeting, Sabga and Meltzer gave Plaintiff an oral, informal warning—that repeated unprofessional conduct could result in a Letter of Reprimand or more severe disciplinary action—and discussed performance standards regarding communication. (DSOF ¶ 42.)

In Summer 2015, Plaintiff was having repeated disagreements with Meltzer about her work. (DSOF ¶ 43.) Sabga met with Plaintiff, who expressed frustration that Meltzer was not providing enough guidance. (*Id.*) Sabga then met with Meltzer and told him he was expected to meet with Plaintiff weekly to discuss her work and challenges with her audits, and to provide timely guidance. (*Id.*) Sabga then informed Human Resources Specialist Debbie Beaudreault about what had transpired, and Beaudreault advised Sabga to have an informal counseling session with Plaintiff to discuss her behavior and found a communications course in Tucson, which Beaudreault felt might improve Plaintiff's communication and conflict resolution skills. (DSOF ¶ 44.) Sabga then informed Plaintiff

---

[7] Plaintiff objects to Sabga's characterization that Plaintiff was "calling [Ms. Estrellado] inappropriate names" as speculative and conclusory opinion testimony by an interested witness. (PCSOF ¶ 18.) But Plaintiff fails to point to any record evidence supporting a dispute, and Sabga's testimony is based on personal knowledge and plainly admissible.

of the course at the June 18, 2015 meeting, at which he also advised Plaintiff that continued unprofessional communication and behavior may be subject to disciplinary action. (DSOF ¶ 45.)

**Claim (d).** Plaintiff alleged in her Complaint that in May 2016, while Plaintiff was working part time on maternity leave, Sabga denied her the opportunity to correct an audit, and then gave the audit to another auditor. (DSOF ¶ 47.) Plaintiff testified that the act of giving the audit to another auditor was not gender discrimination or retaliation. (*Id.*)

**Claim (e).** Plaintiff claims that on August 22, 2016, Sabga did not permit her to attend a meeting regarding work she audited and she was not given an opportunity to discuss changes to her work. (DSOF ¶ 48; PCSOF ¶ 26.) When Plaintiff called into the meeting to go through her part of the audit, Sabga said he "did not want her on the call and . . . [she] was not needed on the call, and hung up." (DSOF ¶ 48; PCSOF ¶ 23.) Plaintiff later received a call from Hehe, and she said they wanted to change Plaintiff's portion of the audit to reflect that there were no findings. (*Id.*) Plaintiff supported her findings, but Sabga did not give her an opportunity to "clean it up." Plaintiff was asked to change her audit opinion. (*Id.*) Plaintiff testified that she believed Sabga treated her differently because of her disability and was trying to provoke her. (DSOF ¶ 49; PCSOF ¶ 24.)

According to Sabga, after the meeting, Sabga suggested Plaintiff meet with Hehe, Thomas, and Technical Specialist Joe Creasy to add necessary information to support her work, which she did. (DSOF ¶ 52; PCSOF ¶ 26; Doc. 65-8 at 13–14.) According to Hehe, she had asked Plaintiff to call the conference room phone for the August 22 meeting, but Sabga had not intended for Plaintiff to be a part of the meeting. (DSOF ¶ 53; PCSOF ¶ 27.) During the meeting, management determined the proposed costs should be considered supported, which was different from Plaintiff's conclusion. (*Id.*) A day or two later, Hehe found, based on her review, that the costs should be unsupported and met with Sabga and Moore to show them why. (*Id.*) Sagba and Moore agreed. (*Id.*)

**Claim (f).** Between Friday, August 26, 2016 and Sunday, August 28, 2016, Plaintiff and Hehe exchanged text messages while their team was working on a project with a

deadline on Monday, August 29. (DSOF ¶ 55.) Prior to the weekend, Plaintiff exported her work portion with corrections she had made. (DSOF ¶ 56.) Hehe reviewed the work, noted some corrections were no longer fixed, and texted Plaintiff on Saturday, August 27, to ask about the corrections she had made. (*Id.*) Plaintiff responded that she must have pulled an old copy, then texted: "I'm off for the rest of the night. I apologize for the stress I've put you through. Next time when a decision is made without me I'll keep everything in my apps package just in case a ten minute explanation doesn't cause me to TRY to fix everything in 2 days!" (*Id.*; Doc. 65-21 at 21.) Hehe asked for further clarification, attempted to call Plaintiff (which went straight to voicemail), then texted, "This is NOT something you want to do to me right now." (DSOF ¶ 57; Doc. 65-21 at 21.) Plaintiff wrote that she was with her family at the time. (DSOF ¶ 57.)

After further discussion, Hehe texted that she had to go back to the work Plaintiff had exported because "she just spent hours on it." (DSOF ¶ 58.) Plaintiff wrote back,

> You mean like when I had to spend hours bringing SAS back in if I was given 10 minutes to explain? Staying up until 2am on wed and 11 last night getting this to you? I'm sorry I spent the whole month away from my family trying to help you and get this out on time. This has been a really stressful and painful experience when it didn't have to be. Pushing me is only going to make me shut down and not care.

(*Id.*) At a meeting on August 31, 2016 to discuss her audit results, Plaintiff told Hehe again that she pulled the wrong version of the package to make additional corrections. (DSOF ¶ 59.) Plaintiff testified that Hehe's text messages constituted gender and disability discrimination but she was not aware of what Hehe's motivations were. (DSOF ¶ 60; PCSOF ¶ 29; Westling Dep. 113:7–114:11, Doc. 65-5 at 52–53.) Although Plaintiff was the only member of the team Hehe contacted over the weekend, two women were not contacted, and Plaintiff was the lead auditor responsible for writing the report. (DSOF ¶¶ 59, 61–63.) Plaintiff testified that Hehe retaliated against her because Plaintiff did not answer her calls and because Plaintiff had previously shown that her work was actually supported. (DSOF ¶ 64.)

**Claim (g).** After consulting with HR, Sabga issued Plaintiff a Letter of Reprimand ("LOR") on October 4, 2016. (DSOF ¶¶ 72–73; PCSOF ¶ 36.) Plaintiff maintains the LOR

was issued out of retaliation for having previously spoken with Sabga's supervisor and for trying to have a union representative present at a meeting with Hehe. (DSOF ¶¶ 74–75.) Plaintiff first contacted an Equal Employment Office ("EEO") counselor after the LOR was issued, also on October 4, 2016. (DSOF ¶ 77; PCSOF ¶ 38.)

Sabga provided several reasons for the LOR, including: (1) refusing to make recommended corrections, leading to additional work for a lead auditor; (2) an inappropriate and unprofessional[8] message exchange with Supervisory Auditor Debi Moore; (3) an inappropriate and sarcastic email Plaintiff sent to Hehe on August 29, 2016, following the weekend text messages described in **Claim (f)**; (4) an inappropriate and unprofessional instant message Plaintiff sent Hehe, also on August 29, 2016; (5) leaving work without notifying Hehe of Plaintiff's work's status, after Hehe had asked Plaintiff to make corrections and notify her when the work—that was due to a client agency that day— was ready; and (6) emailing the client agency directly despite Hehe asking Plaintiff to notify her when it was ready so she could review it, and then accusing Hehe of being "unprofessional" and "emotionally abusive." (DSOF ¶¶ 65–71; PCSOF ¶¶ 30–35.)

> **Claim (h).** In the October 4, 2016 LOR, Sabga wrote:
>
> > Your conduct may be indicative that you are experiencing problems that may be difficult to cope with on your own. I am genuinely concerned about your personal well-being. Consequently, as I have previously mentioned to you when I have counseled you regarding prior incidents of unprofessional behavior, I encourage you to contact a certified counselor from the Employee Assistance Program ["EAP"] . . . This program is reflective of the Agency's concern that employees have resources available to help them cope with situations that occur at home or within the workplace.

(DSOF ¶ 78; PCSOF ¶ 39.) Plaintiff alleges this language constitutes disability discrimination because it indicates Sabga knew about her mental health issues and suggests the possibility that Altemus disclosed her mental health condition to Sabga. (DSOF ¶¶ 80–81; PCSOF ¶ 40.) In an EEO Declaration dated April 24, 2017, Sabga stated he was not aware that Plaintiff claimed to have a disability or had an impairment or medical condition.

---

[8] Plaintiff states she "preserves relevancy/characterization objections to adjectives such as 'inappropriate' and 'refused.'" (PCSOF ¶ 30.) However, Plaintiff does not dispute that she sent the quoted texts, messages, and emails, or that Sabga and other employees described them as "unprofessional" and "inappropriate."

(DSOF ¶ 84; PCSOF ¶ 41.) According to Altemus, Plaintiff informed him of her medical condition on March 17, 2017. (DSOF ¶ 83; PCSOF ¶ 41; Doc. 65-17 at 5.) According to Plaintiff, she shared her diagnoses of anxiety and postpartum depression with Altemus in 2016. (DSOF ¶ 82; Doc. 65-16 at 2.)[9] Plaintiff testified she believed Altemus told Sabga about Plaintiff's impairment around March 2017, which is when her Performance Improvement Plan ("PIP") was implemented. (DSOF ¶¶ 85–86; PCSOF ¶ 41; Doc. 65-21 at 15.) As of May 2017, Plaintiff had never submitted any medical documentation evidencing a disability or requesting a reasonable accommodation. (DSOF ¶ 87; PCSOF ¶ 41.)

Plaintiff's LOR is the only LOR Sabga has written in his career. (DSOF ¶ 91; PSAF ¶ 10.) The LOR went through multiple levels of review, including with HR Specialist Coombs. (DSOF ¶ 93; PCSOF ¶ 44.) Coombs, who was not aware of Plaintiff's medical conditions, advised Sabga to include the language about the EAP. (DSOF ¶¶ 93–94; PCSOF ¶¶ 44–45.) The parties dispute whether the references to Plaintiff's emotional wellbeing and the EAP were standard language DCAA used in all disciplinary notices, (DSOF ¶¶ 93, 95), or whether "Plaintiff's LOR added individualized language implying a potential condition and expressing personal concern," (PCSOF ¶¶ 44, 46).

**Claim (i).** On February 7, 2017, Plaintiff told Hehe that on January 10, 2017, Sabga was walking towards her down a walkway "but did not step aside to let her pass, instead brushing by her." (DSOF ¶ 97; PCSOF ¶ 48; Doc. 65-21 at 8.)[10] Plaintiff told Coombs that Sabga had pushed her against the wall as he passed by. (DSOF ¶ 96; PCSOF ¶ 47.) When Coombs asked Plaintiff questions about the incident, Plaintiff became argumentative and raised her voice. (DSOF ¶ 96; PCSOF ¶ 47.) Sabga denies this incident occurred. (DSOF

---

[9] Plaintiff does not provide a specific date in 2016 on which she told Altemus about her medical conditions. Additionally, at her deposition, Plaintiff testified that she told Altemus she "had been suffering from depression and anxiety, and . . . had been taking medication for that," in the "2014 area." (DSOF ¶ 82; Westling Dep. 35:17–36:8, Doc. 65-5 at 7–8.)

[10] Plaintiff misstates Hehe's declaration. (*See* PCSOF ¶ 48.) Hehe stated that "[Plaintiff] did not state that [Sabga] knocked her into the wall." (Doc. 65-21 at 8.) Elsewhere in the record, Plaintiff described the physical contact as Sabga "bumping into [her]," and "[p]ush[ing] past the Plaintiff in the hallway, knocking [her] into the wall." (Doc. 65-3 at 15, 22.)

¶ 99; PCSOF ¶ 49.) Plaintiff testified that this incident was gender discrimination and retaliation for her EEO Complaint . (DSOF ¶¶ 100, 103; PCSOF ¶¶ 50, 53.) Sabga became aware of Plaintiff's EEO activity when he was contacted and interviewed by an EEO investigator on October 31, 2016. (DSOF ¶ 104; PCSOF ¶ 54.)

**Claim (j).** Hehe completed a progress review and exit appraisal for Plaintiff on February 13, 2017, as Hehe was being promoted and transferred to another DCAA office. (DSOF ¶ 105.) Hehe rated Plaintiff's performance unacceptable in two critical elements—Communication and Organizational Support and Working Relationships—resulting in an Unacceptable summary rating. (DSOF ¶ 106.) According to Hehe, Plaintiff's communications had become increasingly unprofessional and disrespectful, and Plaintiff demonstrated a lack of teamwork. (DSOF ¶ 115; PCSOF ¶ 58.) Hehe testified that Plaintiff was creating problems at the team member level, causing other team members to struggle to get their work done, and "it just became apparent that this was an ongoing problem. The letter of reprimand didn't seem to have fixed the problem." (DSOF ¶ 116; PCSOF ¶ 59; Doc. 65-27 at 31–32.)

**Claim (k).** After the "Unacceptable" performance appraisal, Hehe and Sabga suspended Plaintiff's telework privileges. (DSOF ¶¶ 125–26; PCSOF ¶¶ 67–68.) DCAA policy requires employees maintain performance ratings of at least "Fully Successful" for all critical job elements to be eligible for telework. (*Id.*)

**Claim (l).** After the "Unacceptable" performance appraisal, Plaintiff was taken off the proposals team, which handles high-risk, fast-paced projects. (DSOF ¶¶ 127–29.) Hehe sought guidance from Coombs on implementing a PIP for Plaintiff, but Hehe was promoted and transferred to another DCAA office. (DSOF ¶ 131; PCSOF ¶ 73.) Plaintiff was moved under Supervisory Auditor Tom Altemus's supervision on March 13, 2017. (DSOF ¶¶ 134, 136; PCSOF ¶¶ 74, 76.)

**Claim (m).** After the "Unacceptable" performance appraisal, Plaintiff was placed on a PIP pursuant to the Union Collective Bargaining Agreement. (DSOF ¶¶ 137–38; PCSOF ¶¶ 77–78.) Hehe, Sabga, and Altemus sought and received guidance from Coombs

on drafting the PIP and implementing it. (DSOF ¶ 139; PCSOF ¶ 79.)

**Claim (n).** In March 2017, after Plaintiff was placed on the PIP, Sabga disclosed information about Plaintiff being on a PIP to multiple people. (DSOF ¶¶ 141–44.) Agency policy allows information regarding an employee's PIP to be disclosed to first level supervisors and upper management. (DSOF ¶ 149; PCSOF ¶ 86.) Defendant maintains that Sabga discussed information about Plaintiff's PIP with Plaintiff's supervisors—Page, Altemus, and Hehe—and Coombs only. (DSOF ¶¶ 142–44.) Plaintiff testified that Sabga disclosed information at a supervisors' meeting where her PIP and communications issues were discussed. (PCSOF ¶ 83.)

**Claim (o).** Plaintiff alleges Sabga did not allow her official time to work on her EEO complaint. (DSOF ¶¶ 150–58; PCSOF ¶¶ 87–90.) Sabga informed Plaintiff about the process for requesting official time to prepare a grievance and stated she would not be authorized to charge additional hours unless she provided a written request. (DSOF ¶¶ 152–53.) Plaintiff was not denied use of official time; she charged 13.75 hours of grievance and appeals. (DSOF ¶ 155.) According to Coombs, under agency policy and the collective bargaining agreement, "official time" does not include time consulting with a private attorney. (DSOF ¶¶ 156–58; PCSOF ¶¶ 89–90 (partially disputing DSOF ¶¶ 157–58 but failing to cite record evidence supporting a dispute).)

**Claim (p).** In June 2017, Plaintiff attempted to have new auditing software installed on her computer, and Altemus did not approve Plaintiff's use of the software. (DSOF ¶¶ 160–61; PCSOF ¶¶ 91–92.) According to Altemus and Sabga, the software was not fully supported by the agency and would require significant training, all auditors used the Microsoft suite of applications, and the new software was not needed for Plaintiff's job. (DSOF ¶¶ 161–62; PCSOF ¶¶ 92–93.) The new software's capability was still being tested, and Sabga had approved one auditor, David Daws, to attend a training on the software. (DSOF ¶¶ 162–63; PCSOF ¶¶ 93–94.) Daws reported that it was difficult to use and would not be useful for the agency. (DSOF ¶ 163; PCSOF ¶ 94.)

**Claim (q).** Between July and December 2017, Altemus and Supervisory Auditor

Cindy Zadro[11] denied Plaintiff's requests to transfer off Altemus's team. (DSOF ¶¶ 172, 178, 181; PCSOF ¶¶ 105, 108.) Altemus did not have decisional authority to transfer Plaintiff, but he conferred with Sabga and Zadro, who agreed Plaintiff should not transfer for a variety of reasons, including because: (1) Plaintiff had just completed her PIP and was on a one-year observation period; (2) Plaintiff had a significant workload which, if transferred, would require another auditor to finish her work in progress; (3) Plaintiff's communication and performance issues; (4) Zadro, as a temporary manager, did not want to change Sabga's decision to assign Plaintiff to Altemus or rearrange his team assignments; and (5) Sabga had not yet honored transfer requests for the new fiscal year and had not extended an office-wide invitation for transfer requests. (DSOF ¶¶ 173–84; PCSOF ¶¶ 100–11.)

**Claim (r).** In July 2017, Altemus did not recommend Plaintiff for a temporary supervisor position. (DSOF ¶ 188; PCSOF ¶ 115.) Regional Audit Manager Lisa Wieczorkowski asked supervisors to recommend candidates for the temporary supervisor position who, on their last performance appraisal, received a rating of "Exceeds Fully Successful." (DSOF ¶ 189; PCSOF ¶ 116.) Altemus recommended four auditors, two women and two men with higher performance appraisals than Plaintiff, for the position. (DSOF ¶ 190; PCSOF ¶ 117.) Plaintiff completed her PIP on June 30, 2017 and was on a one-year observation period at the time Altemus was asked to make recommendations. (DSOF ¶ 195; PCSOF ¶ 122.)

**Claim (s).** Plaintiff alleges that in August 2017 Altemus discredited her claim that she achieved reconciliation on an audit. (DSOF ¶¶ 200–05; PCSOF ¶¶ 127–30.)

**Claim (t).** Plaintiff alleges that in August 2017 Altemus told Plaintiff her step increase would be delayed. (DSOF ¶¶ 206–07; PCSOF ¶¶ 131–32.) Altemus consulted with Coombs after receiving notice that Plaintiff would be eligible for a step increase on September 3, 2017, Altemus and Coombs attended to the matter, and Plaintiff received her step increase on time. (DSOF ¶¶ 209–14; PCSOF ¶¶ 134–39.)

---

[11] Zadro was acting Resident Auditor while Sabga was on temporary leave in late 2017. (DSOF ¶ 174; PCSOF ¶ 101.)

**Claim (u).** Plaintiff alleges Altemus falsely accused her of not communicating with a coworker, Jesse Hancock. (DSOF ¶¶ 215–18; PCSOF ¶¶ 140–41.)

**Claim (v).** In December 2017, Altemus denied Plaintiff's request for a day of annual leave to take her dog to the vet. (DSOF ¶¶ 221–22; PCSOF ¶¶ 146–47.) On December 4, 2017, Zadro emailed the office informing staff that a staff conference was scheduled for December 14. (DSOF ¶ 224; PCSOF ¶ 149.) On December 11, 2017, Plaintiff emailed Altemus requesting to take leave and telework on December 14, and on December 12, 2017, Altemus advised Plaintiff that her request was not approved. (DSOF ¶¶ 225, 236; PCSOF ¶¶ 150, 161.) Zadro and Altemus considered attendance at the staff conference mandatory, unless auditors had leave approved prior to announcement of the staff conference or due to unforeseen emergencies, and DCAA policy states that leave may be granted subject to advanced supervisory approval. (DSOF ¶¶ 227–33; PCSOF ¶¶ 152–58.) After Altemus denied Plaintiff's request, she threatened to file an EEO complaint and asked for two hours of leave to charge EEO (which Altemus approved). (DSOF ¶ 237; PCSOF ¶ 162.) Altemus told Plaintiff she was required to attend the team building exercises and approved 3.5 hours of leave beginning after the team building activities. (DSOF ¶¶ 237–38; PCSOF ¶¶ 162–63.)

**Claim (w).** Plaintiff alleges that Altemus called her after work hours on December 15, 2017, after Plaintiff wrote an office-wide email on December 14, 2017 that raised issues from 2014. (DSOF ¶¶ 239–41; PCSOF ¶¶ 164–66.) On the date of the staff conference, Plaintiff sent an office-wide email that triggered negative responses from multiple coworkers. (DSOF ¶¶ 241–42; PCSOF ¶¶ 166–67.) Altemus and Zadro conferred with Coombs, who advised that they should talk with Plaintiff at the earliest opportunity to let her know the email was inappropriate. (DSOF ¶ 244; PCSOF ¶ 169.) Zadro originally called Plaintiff during work hours and left a message. Plaintiff called back later that afternoon and stated she was off work. Altemus offered to approve credit hours for the call, and Plaintiff agreed. (DSOF ¶¶ 245–49; PCSOF ¶¶ 170–74.)

**Claim (x).** Plaintiff alleges that in January 2018, Altemus supported a lead auditor's

directives related to an audit on which Plaintiff was working. (DSOF ¶¶ 250–52; PCSOF ¶¶ 177–78.)

**Claim (y).** On January 23, 2018, Altemus issued Plaintiff a six-month progress review that stated Plaintiff's performance did not meet the standard in the element of "Internal Communication and Support," as stated in her performance plan. (DSOF ¶¶ 266–67; PCSOF ¶¶ 188–89.) Plaintiff testified she believed retaliation motivated the performance review. (DSOF ¶¶ 268–71; PCSOF ¶¶ 190–92.) The performance review noted several examples of issues, including: (1) a significant decrease in cooperation and lack of support for DCAA core values; (2) an uncooperative and abrasive attitude in recent meetings; (3) the inappropriate email sent to the entire office; (4) failure to demonstrate an attitude of cooperation in relation to the staff conference team building exercise; and (5) being uncooperative and disrespectful to her supervisor regarding training planning and development. (DSOF ¶ 267; PCSOF ¶ 189.)

**Claim (z).** On February 13, 2018, Altemus drafted and Sabga reviewed, researched, and signed a memorandum with the subject: Proposed Notice of Removal for Unacceptable Performance (Doc. 65-39), proposing to remove Plaintiff from employment with the DCAA and placing her on administrative leave with pay for 30 days. (DSOF ¶ 274; PCSOF ¶ 193; Doc. 65-39 at 2.) The memorandum states Plaintiff had been issued a PIP in March 2017 for poor performance in two critical job elements and although she had brought her performance back to fully successful by June 2017, her performance could not become unacceptable within a year of the PIP's issuance. (DSOF ¶ 275; PCSOF ¶ 194.) The memorandum describes Plaintiff's conduct since coming off the PIP for which her performance dropped below fully successful, including Plaintiff's: (1) December 11, 2017 leave request and related events; (2) unprofessional instant message status; (3) observed disrespectful and confrontational disposition, including at an August 3, 2017 meeting with Altemus; (4) defiant attitude, including refusal to cooperate with her supervisor in training selections; and (5) use of her phone during meetings for nonurgent matters. (DSOF ¶¶ 276–82; PCSOF ¶¶ 195–201.) Altemus and Sabga determined Plaintiff's performance had been

steadily declining and she had failed to demonstrate she possessed the communication skills necessary to be at an acceptable level of performance. (DSOF ¶ 283; PCSOF ¶ 202.) Altemus and Sabga conferred with Coombs regarding the proposed removal, and Altemus provided supporting documentation to Sabga. (DSOF ¶ 284; PCSOF ¶ 203.)

**Claim (aa).** Plaintiff alleges that Sabga made harassing comments at a meeting on June 26, 2019, after she was reinstated and returned to the office following Merit Systems Protection Board ("MSPB") proceedings, to the effect of welcoming Plaintiff back being a challenge and expressing uncertainty about her future at DCAA. (DSOF ¶ 285 (citing Doc. 1 ¶¶ 66–68); PCSOF ¶ 204.)[12]

**Claim (bb).** Plaintiff alleges her first paycheck after being reinstated was delayed out of retaliation. (DSOF ¶¶ 292–93; PCSOF ¶¶ 211–12.) HR Specialist Coombs reached out to Workforce Acquisition Management Staff/HR Specialist Todd Haslem for assistance because the hiring action was outside her area of responsibilities. (DSOF ¶ 294; PCSOF ¶ 213.) According to Coombs, Plaintiff's rehiring was a rushed action and there was confusion between Coombs and Haslem about their relative responsibilities. (DSOF ¶¶ 295–96; PCSOF ¶¶ 214–15.) Because DCAA's staffing team mistakenly treated Plaintiff as an employee returning to work when they should have treated her as a new hire, Plaintiff

---

[12] Plaintiff disputes DSOF ¶ 285 "to the extent Defendant implies a lack of evidentiary support" for Sabga's comments. (PCSOF ¶ 204.) Review of the filings, however, shows that Plaintiff fails to support the claim of harassment alleged in **Claim (aa)**. Plaintiff cites to her own deposition testimony, where she describes one statement: "[Sabga] telling Joe and Carolyn Pierides and Joe Creasy that finding a place back in to [sic] me was a challenge." (PCSOF ¶ 204 (citing Westling Dep. 234:14–236:8, Doc. 65-5 at 128–30).) On its face, this statement is not harassment. Plaintiff also mentions an email in which she wrote Sabga's statements down verbatim, (Westling Dep. 234:24–235:8, Doc. 65-5 at 128–29), but she does not provide or cite to that email in her statements of fact. (*See* PCSOF ¶¶ 204–10; PSAF ¶ 87.) In summarizing Plaintiff's claims, Defendant cited to Plaintiff's unverified complaint where Plaintiff alleged Sabga said: (1) "the teams are already established, and everyone works extremely well together, and including you on the team would be a challenge"; and (2) "your experience is needed on a priority audit, but after September, I have no idea what is going to happen to you." (Doc. 1 ¶¶ 66–68.) But an unverified complaint "cannot be considered as evidence at the summary judgment stage." *Moran v. Selig*, 447 F.3d 748, 759–60 (9th Cir. 2006). Sabga denies making the statements, and the other meeting attendees, Joe Creasy and Carolyn Pierides, testified that Sabga did not make harassing comments and Sabga's comments were of a welcoming nature and trying to encourage a fresh start. (DSOF ¶¶ 288–91; PCSOF ¶¶ 207–10.) Thus, there is insufficient evidentiary support for **Claim (aa)**. Regardless, the claim fails for reasons described *infra*.

did not get properly processed or sworn in and the agency did not obtain paperwork (including direct deposit and tax forms) from Plaintiff. (DSOF ¶ 297; PCSOF ¶ 216.)

Without direct deposit information, DCAA staff did not know how to get Plaintiff's paycheck to her; Pierides entered Plaintiff's time into the system but did not know why Plaintiff did not get paid on July 12, 2019. (DSOF ¶¶ 298–99; PCSOF ¶¶ 217–18.) On July 15, 2019, Plaintiff inquired about her paycheck, and Alice Harrigan in the payroll department informed Plaintiff her check had been sent to headquarters because her address and direct deposit information were not entered into the payroll system. (DSOF ¶ 300; PCSOF ¶ 219.) DCAA was unable to locate the check after it arrived at headquarters, cited errors that occurred in the mailroom, and requested funds be transferred to Plaintiff's bank account, now that staff had obtained Plaintiff's direct deposit information. (DSOF ¶¶ 302–06; PCSOF ¶¶ 221–24.) Plaintiff received her paycheck on August 8, 2019. (DSOF ¶ 307; PCSOF ¶ 225.)

## II. Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendant argues **Claims (y)** and **(z)** are barred by the doctrines of res judicata and collateral estoppel, and therefore the Court lacks subject matter jurisdiction over them, because they were adjudicated by the MSPB and Equal Employment Opportunity Commission ("EEOC"). Res judicata is an affirmative defense, not a matter of subject matter jurisdiction. *See Thompson v. County of Franklin*, 15 F.3d 245, 253 (2d Cir. 1994) ("[T]he doctrine of *res judicata* or issue preclusion in no way implicates jurisdiction."); *Berwind Corp. v. Comm'r of Soc. Sec.*, 307 F.3d 222, 233 n.14 (3d Cir. 2002) ("Res judicata is an affirmative defense and not a doctrine that would defeat subject matter jurisdiction." (cleaned up) (citation omitted)); *In re Franklin Sav. Corp.*, 385 F.3d 1279, 1286 (10th Cir. 2004) ("Res judicata is *not* a jurisdictional bar; it is an affirmative defense." (cleaned up) (citation omitted)); *Szanto v. Szanto*, No. 19-CV-2043, 2022 WL 3572993, at *7 (D. Or. Aug. 19, 2022) ("[Claim preclusion] does not divest the Court of subject matter jurisdiction."); *cf. N.Y. Life Ins. Co. v. Gunwall*, 675 F. Supp. 3d 1126, 1132 (W.D. Wash. 2023) ("A defendant may raise the affirmative defense of res judicata in a motion to dismiss

under Rule 12(b)(6)." (citing *Scott v. Kuhlmann*, 746 F.2d 1377, 1378 (9th Cir. 1984))). Thus, the Court does not have a duty to evaluate Defendant's res judicata offense prior to proceeding to the merits of the claims. Because the Court grants summary judgment in favor of Defendant on Plaintiff's claims in their entirety, the Court does not decide Defendant's motion to dismiss with respect to the res judicata defense.

Defendant also argues Plaintiff's claim for backpay is moot. (Doc. 67 at 9; *see* Doc. 1 ¶ 78 (seeking backpay).) Plaintiff received the backpay that the MSPB awarded to her, and Plaintiff confirmed she is not seeking backpay in these proceedings. (DSOF ¶¶ 17–18.) Thus, the Court grants Defendant's Rule 12(b)(1) Motion to Dismiss any pending claim for backpay because such claims are moot. *See Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010) ("We lack jurisdiction to decide moot questions." (citation and internal quotation marks omitted)).

### III.    Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., the fact might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First*

*Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968), however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all justifiable inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

## IV.    Discussion

Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating "against any individual with respect to compensation, terms, conditions, or privileges of employment, because of the such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). When the Federal Government is the employer, "[a]ll personnel actions affecting employees . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." *Id.* § 2000e-16(a).

As detailed above, Plaintiff's employment discrimination claims are based on 28 alleged discriminatory or retaliatory acts by her employer and supervisors. (*See* DSOF ¶ 3; Doc. 67 at 4 n.1; Doc. 97-3.) Plaintiff's complaint does not specifically allege which acts are based on sex discrimination, disability discrimination, or retaliation. (*See* Doc. 1 ¶¶ 42–43, 63–64, 75–76.) Plaintiff does not dispute DSOF ¶ 3, which describes the distinct acts and states Plaintiff alleges sex discrimination in 27 of the acts, disability discrimination in one of the acts, and retaliation in 23 of the acts. (*See* DSOF at 2–6, ¶ 3.) However, later in Defendant's Statement of Facts, also in paragraphs Plaintiff does not dispute, Defendant cites Plaintiff's deposition testimony as narrowing some of the acts to only one basis. For example, while DSOF ¶ 3 states Plaintiff alleges **Claim (a)**, the denial of a Summer 2015 transfer request, was motivated by both sex discrimination and retaliation, DSOF ¶ 23

states Plaintiff "does not maintain the denial of her [2015] transfer was retaliatory." (DSOF ¶ 23 (undisputed).) Plaintiff's Opposition does little to clarify the alleged motivations behind each discriminatory or retaliatory action and asserts a hostile work environment claim not explicitly pleaded in the Complaint. The Court addresses the 28 discrete actions where applicable in the analysis below. The Court first addresses Defendant's arguments regarding timeliness and abandonment of claims before turning to Plaintiff's Title VII sex discrimination, retaliation, and hostile work environment claims.

### A. Timeliness

Defendant argues **Claims (a)**, **(b)**, **(c)**, and **(d)** are time-barred. (Doc. 67 at 9–10.) "Before a federal civil servant can sue his employer for violating Title VII, he must, among other things, 'initiate contact' with an Equal Employment Opportunity counselor at his agency 'within 45 days of the date of the matter alleged to be discriminatory.'" *Green v. Brennan*, 578 U.S. 547, 549–50 (2016) (citing 29 C.F.R. § 1614.105(a)(1) (2015)).[13] The parties agree that discrete acts outside the limitations period are not independently actionable. (*See* Doc. 67 at 10 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 122 (2002)); Doc. 76 at 5 (citing same)). It is undisputed that Plaintiff first initiated contact with an EEO counselor on October 4, 2016. (DSOF ¶ 11; PCSOF ¶ 3.) Thus, independent discriminatory acts occurring prior to August 20, 2016 are time-barred. Plaintiff alleged and does not dispute that **Claims (a)**, **(b)**, **(c)**, and **(d)** occurred prior to August 20, 2016. (*See* Doc. 1 ¶¶ 21–26; Doc. 76.) Therefore, the Court grants summary judgment to Defendant on **Claims (a)**, **(b)**, **(c)**, and **(d)** as independent acts.[14]

//

//

//

[13] Although Plaintiff does not appear to allege **Claims (a)**, **(b)**, **(c)**, or **(d)** are based on disability discrimination, the exhaustion requirements applicable to Title VII claims also apply to Rehabilitation Act claims. *See Boyd v. U.S. Postal Serv.*, 752 F.2d 410, 412–13 (9th Cir. 1985).

[14] Plaintiff concedes summary judgment on these independent claims because her only response to Defendant's timeliness argument is that time-barred discrete incidents may be considered as part of a hostile work environment claim. (Doc. 76 at 11–13.) Plaintiff's hostile work environment theory is addressed *infra* Section IV.E.

- 18 -

**B. Abandoned Claims**

Plaintiff does not defend the following discrete actions in her Opposition: **Claims (a)**, **(d)**, **(e)**, **(f)**, **(o)**, **(s)**, **(u)**, and **(x)**. (*See* DSOF ¶ 3; Doc. 76; Doc. 97 at 5.) Therefore, Plaintiff has abandoned her claims to the extent they were based on these discrete actions. *See Hernandez v. Maricopa Cnty. Cmty. Coll. Dist.*, No. CV-21-00742, 2024 WL 1156570, at *5 n.3 (D. Ariz. Mar. 18, 2024), *appeal dismissed*, No. 24-2401, 2024 WL 4564180 (9th Cir. July 31, 2024) (declining to consider adverse employment actions alleged in complaint but undefended in response to motion for summary judgment); *Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (reasoning that a partial opposition to a motion for summary judgment in counseled cases may imply an abandonment of some claims).

In her Complaint, Plaintiff also alleged a disability discrimination claim under the Rehabilitation Act. (*See* Doc. 1 ¶¶ 2, 14, 30, 42.) In **Claim (h)**,[15] (*see* DSOF ¶ 3), Plaintiff alleges Mr. Sabga's reference to her emotional wellbeing in the October 4, 2016 Letter of Reprimand indicated he was aware of Plaintiff's mental disability (anxiety and post-partum depression) and treated a male employee differently. (Doc. 1 ¶ 30.) However, Plaintiff's Opposition fails to address the disability claim or Defendant's arguments against it. (*See* Doc. 76.) Her failure to defend the disability discrimination claim amounts to abandonment of the claim, and the Court will not address it further. *See Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (explaining that the plaintiff "abandoned . . . two claims by not raising them in opposition to the [defendant]'s motion for summary judgment"); *Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 143 (2d Cir. 2016) (holding plaintiff abandoned hostile work environment claims in district court "by failing to argue that they should survive [defendant]'s motion for summary judgment"); *Pac. Dawn LLC v. Pritzker*, 831 F.3d 1166, 1178 n.7 (9th Cir. 2016) (reasoning plaintiffs waived argument by not raising it in their opposition to the defendants' motion for summary judgment). In fact, Plaintiff appears to have explicitly abandoned her Rehabilitation Act claim by conceding that she "brings these claims under Title VII . . . as

---

[15] Plaintiff does not dispute that **Claim (h)** is the only incident of disability discrimination she alleges in this case. (DSOF ¶ 81; PCSOF ¶ 40.)

the sole statutory basis for her claim of relief." (DSOF ¶ 4; *see* PCSOF at 1 (failing to dispute DSOF ¶ 4).)

### C. Title VII – Sex Discrimination

Claims alleging Title VII discriminatory treatment typically follow the *McDonnell Douglas* framework:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)). However, when responding to a summary judgment motion, plaintiffs may choose to "proceed by using the *McDonnell Douglas* framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated [the employer]." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004). The Court interprets Plaintiff's Opposition as applying the *McDonnell Douglas* framework to her gender discrimination claims.[16]

To establish a prima facie case of gender discrimination under the *McDonnell Douglas* framework, Plaintiff must demonstrate four elements: "(1) [she] belongs to a protected class, (2) [s]he was performing according to h[er] employer's legitimate expectations, (3) [s]he suffered an adverse employment action, and (4) similarly situated employees were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Reynaga v. Roseburg Forest Prods.*, 847 F.3d 678, 691 (9th Cir. 2017). A proper prima facie case identifies gender as the likely reason for the adverse action. *See Hagans v. Andrus*, 651 F.2d 622,

---

[16] Plaintiff's Opposition brief is not clear on this point because the "Sex Discrimination" section does not cite a single case or explicitly reference either path. (*See* Doc. 76 at 14–17.) However, Plaintiff makes arguments regarding pretext and the elements of a prima facie case that coincide with the *McDonnell Douglas* framework, (*see id.* at 14–17, 26–27), and Plaintiff does not identify direct evidence of discriminatory intent.

625 (9th Cir. 1981); *see also Int'l Broth. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977) (explaining that "[p]roof of discriminatory motive is critical" in Title VII disparate treatment claims); *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1159 (9th Cir. 2010) (noting the prima facie case method is not intended to be rigid, mechanized, or ritualistic, and the ultimate issue is whether the employer is engaging in discrimination). The degree of proof necessary to show a prima facie case is minimal, i.e., less than a preponderance of the evidence. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

Defendant argues Plaintiff fails to meet the third and fourth elements of a prima facie case: adverse action and discriminatory motive. (Doc. 67 at 11–23.) With respect to the third element, clear examples of adverse employment actions include, "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). The parties agree that under *Muldrow v. City of St. Louis*, 601 U.S. 346, 354–55 (2024), adverse employment actions in Title VII discrimination claims are those that cause the employee "some harm respecting an identifiable term or condition of employment." (*See* Doc. 76 at 4; Doc. 97 at 7).[17] "A warning letter or negative review also can be considered an adverse employment action." *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 847 (9th Cir. 2004); *see also Wilson v. City of Fresno*, 763 F. Supp. 3d 1073, 1096 (E.D. Cal. 2025) (explaining letters of reprimand may be adverse actions if they result in employment consequences). Trivial changes to a plaintiff's conditions of employment are insufficient. *See Xu v. LightSmyth Techs., Inc.*, No. 20-CV-01201, 2025

---

[17] Prior to *Muldrow*, the Ninth Circuit required a showing that an adverse employment action "materially" affect compensation, terms, conditions, or privileges of employment. *See, e.g., Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1012 (9th Cir. 2018). Defendant's Motion states the previous standard. (Doc. 67 at 11.) However, *Muldrow* explicitly "change[d] the legal standard used in any circuit that has previously required 'significant,' 'material,' or 'serious' injury. . . . [and] lower[ed] the bar Title VII plaintiffs must meet." 601 U.S. at 355 n.2; *see also Brown v. Wormuth*, No. CV-21-00477, 2024 WL 3553112, at *6 n.3 (D. Ariz. July 26, 2024), *report and recommendation adopted*, 2024 WL 4347864 (D. Ariz. Sept. 30, 2024). Ninth Circuit pre-*Muldrow* cases remain relevant to the Court's analysis because an action found not to be materially adverse under the old, stricter standard would also fail to qualify as adverse under *Muldrow*'s new, lower threshold.

WL 2770511, at \*5 (D. Or. Sept. 25, 2025).

With respect to the fourth element, "a plaintiff may show 'an inference of discrimination in whatever manner is appropriate in the particular circumstances.'" *Hawn*, 615 F.3d at 1156 (quoting *Diaz v. Am. Tel. & Tel.*, 752 F.2d 1356, 1361 (9th Cir. 1985)). Here, Plaintiff proceeds, at least in part, under a theory that her supervisors at DCAA treated similarly situated male employees more favorably. (*See* Doc. 76 at 14.) "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003). Employees must be similar in all material respects, and "what facts are material will vary depending on the case." *See Hawn*, 615 F.3d at 1157–58.

Should Plaintiff succeed in establishing her prima facie case, the second step of the *McDonnell Douglas* framework requires Defendant to articulate a legitimate, nondiscriminatory reason for the challenged action. *See Opara v. Yellen*, 57 F.4th 709, 723 (9th Cir. 2023) (citations omitted). This step does not involve credibility assessments; Defendant has the burden of production only. *Id.*

At the third step, Plaintiff must show Defendant's articulated reason for the challenged action is pretextual. *See id.* "To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." *Vasquez*, 349 F.3d at 642 (citations omitted). Conclusory allegations are insufficient to raise a genuine issue of fact regarding an employer's motive. *Opara*, 57 F.4th at 728–29 (citations omitted). "[W]here abundant and uncontroverted independent evidence suggests that no discrimination occurred, plaintiff's creation of only a weak issue of fact as to whether the employer's reason was untrue will not suffice." *Id.* at 724 (cleaned up) (internal quotation marks omitted) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

As noted above, the Complaint does not specify, for each of the 28 allegedly discriminatory actions, whether Plaintiff's theory is gender discrimination, retaliation, or both. (*See* Doc. 1 ¶¶ 42–43, 63–64, 75–76.) Defendant assumes the Complaint alleges 27

acts of gender discrimination—all actions except **Claim (bb)** which refers solely to retaliation. (*See* DSOF ¶ 3.) At deposition, Plaintiff testified that she is not alleging gender discrimination with respect to 12 of the actions—**Claims (g)**, **(n)**, **(o)**, **(q)**, **(s)**, **(t)**, **(u)**, **(v)**, **(w)**, **(y)**, **(aa)**, and **(bb)**. (*See* DSOF ¶¶ 73, 146, 150, 185, 200, 206, 217, 221, 239, 268, 286, 293 (all undisputed).)[18] In the section of Plaintiff's Opposition defending her gender discrimination claim, Plaintiff cites only eight claims: **(b)**, **(c)**, **(g)**, **(h)**, **(i)**, **(j)**, **(k)**, and **(p)**.[19] Because **Claims (b)** and **(c)** are time-barred,[20] six claims remain—**(g)**, **(h)**, **(i)**, **(j)**, **(k)**, and **(p)**.

//

[18]  Because Plaintiff testified at her deposition that the issuance of the LOR did not involve gender discrimination, Defendant argues **Claim (g)** fails under the "sham affidavit" rule. (Doc. 97 at 11–12.) The rule provides that "a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Nelson v. City of Davis*, 571 F.3d 924, 927–28 (9th Cir. 2009) (quoting *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991)). It is not clear that this rule applies here, and the Court decides **Claim (g)** on other grounds. *See, e.g.*, *Al Qari v. Am. Steamship Co.*, 689 F. Supp. 3d 468, 478–80 (E.D. Mich. 2023) (holding tort-plaintiff's statement in deposition that his fall was an accident was a non-binding evidentiary admission that is not conclusive and may be contradicted by other evidence); *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995) ("When a party testifying . . . during a deposition admits a fact which is adverse to his claim . . . it is generally preferable to treat that testimony as solely an evidentiary admission.").

[19]  For the reasons explained above, *see supra* Section V.B–C, the Court concludes Plaintiff has abandoned gender-based disparate treatment claims with respect to any other discrete acts.

[20]  Despite conceding that **Claim (c)**, the "mandated" communications course, is time-barred, Plaintiff argues it is a basis for her gender-based disparate treatment claim. (Doc. 76 at 14.) The Court concludes **Claim (c)** fails on multiple grounds. First, the communications course was not required; thus, it was not an adverse employment action. It is undisputed that Sabga "recommended that [Plaintiff] consider taking the Communications Course, and Plaintiff agreed to do so." (DSOF ¶ 45; PCSOF at 5 (failing to dispute DSOF ¶ 45).) Additionally, DCAA paid for the course and Plaintiff attended the course during her normal work hours. (Doc. 65-7 at 10.) Plaintiff has not shown how optional, paid communications training caused her some harm regarding the terms and conditions of her employment. Second, even if the communications course were an adverse action, **Claim (c)** fails on the fourth element of the prima facie case because: (1) Plaintiff has not provided any evidence that the two male comparator employees with communications issues were similarly situated to her; and (2) she identifies three female employees with communications issues who were not sent to the course. (DSOF ¶¶ 35–36; PCSOF ¶¶ 15–16.) One of the male comparators was a temporary employee, which materially distinguishes his situation from that of Plaintiff. Plaintiff provides no relevant information about the second, who is identified only as "Matthew," such as his position, job duties, or conduct. (*See* Doc. 76 at 2, 14.) Finally, even if Plaintiff could establish a prima facie case of gender discrimination with respect to **Claim (c)**, Plaintiff provides no evidence to rebut Defendant's legitimate, nondiscriminatory reasons for recommending the course, i.e., her unprofessional communication and behavior. (*See* DSOF ¶¶ 38–46 (undisputed in relevant part).)

**Claims (g) & (h) - October 2016 Letter of Reprimand & Reference to Plaintiff's Emotional Wellbeing.** These claims fail for a multitude of reasons. Beginning with the prima facie case, first, **Claim (h)** is not an adverse employment action.[21] Even assuming "the text of Plaintiff's LOR depart[ed] materially from the agency's neutral template," (Doc. 76 at 15), Plaintiff does not assert such language caused some harm or had any effect on the terms or conditions of her employment; she simply argues the individualized language implies a potential condition and expresses personal concern. (PCSOF ¶ 46; PSAF ¶ 9.)[22] Next, Plaintiff does not show similarly situated male employees were treated more favorably. Plaintiff's LOR was the only LOR Sabga ever issued, meaning he never issued a LOR to any man or woman other than Plaintiff. (DSOF ¶ 91 (undisputed); PSAF ¶ 10.) To the extent Plaintiff identifies "Matthew" and the unidentified temporary auditor as male comparator employees for purposes of **Claims (g)** and **(h)**, (*see* Doc. 76 at 14), Plaintiff argues they engaged in comparable or worse conduct without explaining what that conduct was. *See Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 937 (N.D. Cal. 2016) ("[I]t is not the task of the court to scour the record in search of a genuine issue of triable fact.").

Even if Plaintiff could establish a prima facie case, Plaintiff fails to "put forward specific and substantial evidence challenging the credibility of [her supervisors'] motives." *Vasquez*, 349 F.3d at 642. With respect to the LOR itself (**Claim (g)**), Defendant states Sabga issued the LOR to Plaintiff because of her pattern of inappropriate, unprofessional, abrasive, and sarcastic communications in the preceding months. (DSOF ¶¶ 65–72.) Plaintiff does not dispute that she wrote the emails and messages her coworkers and supervisors found objectionable, and she points to no additional evidence indicating Sabga

---

[21] Although Plaintiff testified that **Claim (g)** alleges retaliation, not discrimination based on sex, Plaintiff's counsel seems to assert **Claim (g)** as an instance of sex discrimination in the Opposition. (Doc. 76 at 14–15.) In an abundance of caution, the Court addresses **Claim (g)** in its analysis of Plaintiff's sex discrimination claims.

[22] For the same reason, **Claim (h)** would also fail as a disability discrimination claim. *See, e.g., Liu v. DeJoy*, 664 F. Supp. 3d 1030, 1041 (C.D. Cal. 2023) (explaining that, like Title VII claims, disability discrimination claims are analyzed under the *McDonnel Douglas* framework and plaintiffs must show they suffered an adverse employment action to establish a prima facie case).

or any other employee involved in these incidents was motivated by gender-based animus. (PCSOF ¶¶ 30–36; PSAF ¶¶ 7–8.) With respect to the LOR's EAP paragraph (**Claim (h)**), Defendant states Sabga's reference to the EAP is standard, HR advised Sabga to include the language, the DCAA Personnel Management Manual specifically instructs managers to reference the EAP, and Sabga was simply advising that resources were available to Plaintiff if she was experiencing personal or mental health issues. (Doc. 67 at 20; DSOF ¶¶ 92–95.) Plaintiff argues the LOR's inclusion of the sentence "I am genuinely concerned about your personal wellbeing," diagnoses her behavior and personalizes Sabga's concern for her, while the standard language simply notes that assistance is available. (Doc. 76 at 15.) Plaintiff fails to explain the connection between using this language and gender-based discrimination, and none is apparent. The addition of this sentence in the LOR is insufficient to rebut Defendant's direct evidence. (Doc. 76 at 15–16; PCSOF ¶¶ 43–46; PSAF ¶¶ 8–9.) No reasonable juror could conclude otherwise.

**Claims (b)[23] & (i) – Sabga Stared at Plaintiff's Chest in 2015 & Pushed Plaintiff in a Hallway in 2017.** Plaintiff fails to establish a prima facie case of gender discrimination with respect to **Claims (b)** and **(i)**. Viewing the evidence in the light most favorable to Plaintiff, the Court assumes these incidents occurred. First, Plaintiff does not identify a term, condition, or privilege of employment that was harmed by the isolated incidents of chest-staring and a "bump" or "push" in the hallway, and none is apparent to the Court. *See Torres v. Deblasis*, 959 F. Supp. 2d 772, 777, 780 (E.D. Pa. 2013) (holding incident where male supervisor allegedly confronted, yelled at, poked, and chest bumped female plaintiff was not an adverse employment action because it "did not result in any change in employment status or benefits"); *cf. Davis v. Team Elec. Co.*, 520 F.3d 1080, 1090, (9th Cir. 2008) (explaining mere ostracism, such as supervisor staring angrily at plaintiff and allowing co-workers to be mean to plaintiff, or male coworkers refusing to speak to plaintiff about anything other than work, does not constitute an adverse employment action); *Tavares v. ASARCO LLC*, No. CV-20-01596, 2022 WL 1811166, at *3 (D. Ariz.

---

[23] Although Plaintiff concedes **Claim (b)** is time-barred, the Court discusses it here to illustrate that it would fail even if it were not time-barred.

June 2, 2022) ("Yelling at or otherwise using a harsh tone towards an employee is not an adverse employment action for the purposes of a discrimination claim."). Nor do the two incidents, which occurred approximately 17 months apart, suggest a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [Plaintiff]'s employment." *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998).

**Claims (j) & (k) – Sabga & Hehe Downgraded Plaintiff's Performance Review and Suspended her Telework in February 2017.** Defendant concedes that the negative performance review and telework suspension are adverse employment actions. (*See* Doc. 67 at 11–14.) In his Reply, Defendant argues Plaintiff "makes no effort to show how she has met her prima facie burden or established pretext for th[ese] discrete act[s]." (Doc. 97 at 12.) The Court agrees. *See Garcia v. GMAC Mortg., LLC*, No. CV-09-0891, 2009 WL 2782791, at *1 (D. Ariz. Aug. 31, 2009) ("If an argument is not properly argued and explained, the argument is waived." (citing LRCiv 7.2(i), (b), (c))); *Pac. Dawn LLC v. Pritzker*, 831 F.3d at 1178 n.7. Plaintiff does little more than mention **Claims (j)** and **(k)** in the context of her gender-based disparate treatment claims.

Regardless, these claims fail at the third step of the *McDonnell Douglas* framework. At step two, Defendant articulated legitimate, nondiscriminatory reasons for the performance review and telework suspension. According to Hehe, Plaintiff's communications had become increasingly unprofessional and antagonistic, and her lack of teamwork and communication issues were making it more difficult for her coworkers to get their work done. (DSOF ¶¶ 115–16.) Plaintiff disputes Defendant's "characterization" of the facts—not the facts themselves—and argues "Hehe is an interested witness whose disavowable testimony should not be credited at this stage." (PCSOF ¶¶ 59–66.) But the Court does not assess credibility at step two, and Plaintiff does not point to evidence refuting Defendant's legitimate nondiscriminatory reasons for the performance review, as required at step three. (DSOF ¶¶ 117–24; PCSOF ¶¶ 59–66.) Plaintiff cites deposition testimony stating that the incidents Hehe cited as support for the negative performance

review were taken out of context, but also admitting that the incidents occurred and she was not misquoted. (*See* DSOF ¶ 123; PCSOF ¶¶ 58–60 (citing Westling Dep. 139:14–19, 140:4–16, Doc. 65-5 at 74–75).) This is not "specific and substantial evidence" of a discriminatory motive. *See Vasquez*, 349 F.3d at 642. With respect to **Claim (k)**, Plaintiff fails to show discriminatory motive or pretext because it is undisputed that loss of telework privileges was a necessary result of her "Unacceptable" performance review under DCAA policy. (DSOF ¶¶ 125–26; PCSOF ¶¶ 67–68.)

**Claim (p) – Altemus Denied Plaintiff Use of New Software in June 2017.** Starting with the prima facie case, the denial of Plaintiff's request to use a new, unapproved software program is not an adverse employment action. Plaintiff does not dispute that the data analytics program, SAS, was: (1) not widely used or supported by DCAA; (2) not necessary to perform Plaintiff's job duties; and (3) being tested for effectiveness and capability for potential office use. (DSOF ¶¶ 161–62; PCSOF ¶¶ 92–93; PSAF ¶ 44.)[24] Essentially, Plaintiff claims that being denied the opportunity to participate in management's testing of SAS was an adverse action. But the denial did not change Plaintiff's terms or conditions of employment whatsoever, let alone harm them. Plaintiff continued to use the agency-supported data analytics and auditing software that all other DCAA auditors used and upon which she had been trained. (*See* DSOF ¶¶ 161–62; PCSOF ¶¶ 92–93); *Reynaga*, 847 F.3d at 692–93 (reasoning a substantial interference with work facilities important to the performance of the job can constitute an adverse employment action). To the extent Plaintiff implies SAS would have improved her working conditions by increasing efficiency or otherwise, she offers no evidence that this is the case.[25] (*See* PSAF ¶¶ 42–48; Doc. 76 at 16); *cf. Davis*, 520 F.3d at 1089–90 ("[A]ssigning more, or

[24] Plaintiff disputes Defendant's characterization of the new software as unnecessary because the office was evaluating it and two male auditors were permitted to train on it during the evaluation period. (PCSOF ¶ 92.) But the fact that the office was evaluating the software does not mean it was necessary for Plaintiff to perform her job. Plaintiff had been performing and continued to perform her job without the software, as did all other DCAA auditors.

[25] It is undisputed that the auditor who attended the training found SAS difficult to use and management concluded it would not be useful for DCAA. (DSOF ¶¶ 162–63; PCSOF ¶¶ 93–94.)

more burdensome, work responsibilities, is an adverse employment action."). Sabga and Altemus simply did not permit Plaintiff to use or participate in testing SAS.

Even if the denial of permission to use SAS was an adverse action, Plaintiff does not argue, and has not shown, the two male auditors, Geoff Baker and David Daws, were similarly situated to her in any material respect. *See Hawn*, 615 F.3d at 1157–58; (Doc. 76 at 16); *see Garcia*, 2009 WL 2782791, at *1 ("If an argument is not properly argued and explained, the argument is waived." (citing LRCiv 7.2(i), (b), (c))). In fact, the evidence Plaintiff cites in support of **Claim (p)** shows she was *not* similarly situated to either in material respects. Unlike Plaintiff, Baker "was a supervisor"; also neither Baker nor Daws were under Altemus's supervision. (Westling Dep. 182:20–22, 184:16–25, Doc. 65-5 at 94–95 (cited in PSAF ¶ 46).) Plaintiff cites to Altemus's and Sabga's EEOC declarations, (PCSOF ¶¶ 92–95; PSAF ¶¶ 44, 47), but neither declaration shows the two males were similarly situated. In fact, Altemus stated, "Mr. Daws . . . was not working on similar assignments [as Plaintiff]," and Sabga stated, "Daws was asked to test the use of SAS . . . because he was the auditor most experienced in performing data analytics on data provided by the defense contractor we audit." (Doc. 65-25 at 7; Doc. 65-29 at 6.)

In sum, Plaintiff has abandoned many of her gender-based claims and the actions she defends are time-barred, not adverse actions, and do not give rise to an inference of discrimination. In addition, Plaintiff has not met her burden to show Defendant's legitimate, nondiscriminatory reasons for taking the actions were pretextual.

### D. Title VII – Retaliation

"Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting 28 U.S.C. § 2000e-3). "Title VII retaliation claims use the same burden-shifting *McDonnell Douglas* framework used for discrimination claims." *Lui v. DeJoy*, 129 F.4th 770, 782 (9th Cir. 2025). "To establish a prima facie case of retaliation,

[Plaintiff] must show that '(1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two.'" *Id.* (quoting *Surrell v. Cal. Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008)). If Plaintiff establishes a prima facie case, the burden shifts to Defendant to provide a legitimate, non-retaliatory reason for its actions, and Plaintiff "must produce evidence to show that the stated reasons were a pretext for retaliation." *Id.* (internal quotation marks omitted).

As mentioned above, the Complaint fails to identify which of the 28 discriminatory actions Plaintiff attributes to retaliation, as opposed to gender discrimination.  (*See* Doc. 1 ¶¶ 42–43, 63–64, 75–76.) The section of Plaintiff's Opposition defending the retaliation claims mentions 19 claims: **(b)–(c)**, **(g)–(n)**, **(p)–(r)**, **(v)–(w)**, and **(y)–(bb)**.[26] For reasons explained above, *see supra* Section IV.B–C, the Court concludes Plaintiff has abandoned retaliation claims with respect to any other discrete acts.

As an initial matter, Plaintiff first engaged in protected activity when she contacted an EEO counselor on October 4, 2016. (DSOF ¶¶ 11–12; PCSOF ¶¶ 3–4; PSAF ¶¶ 5–6.)[27] The conduct alleged in **claims (b)**, **(c)**, **(g)**, and **(h)** occurred prior to the first EEO contact and therefore, "cannot serve as an adverse employment action for her retaliation claim." *Fernandez v. Exec. Mgmt. Servs., Inc.*, No. CV 07-2064, 2009 WL 2870211, at *4 n.4 (D. Ariz. Sept. 2, 2009).

Below, the Court addresses the remaining 15 allegedly retaliatory acts—**Claims (i)**–

---

[26]  As in the section of Plaintiff's Opposition defending her gender discrimination claims, Plaintiff fails to cite a single case or explicitly analyze the steps of the *McDonnell Douglas* framework or elements of a prima facie case of retaliation. (*See* Doc. 76 at 17–23.)

[27]  Plaintiff argues the LOR could be retaliation because it was issued on the same date that she initiated contact with the EEO counselor. (Doc. 76 at 18.) But Plaintiff does not properly dispute Defendant's SOF that the LOR was issued *before* Plaintiff first contacted the counselor. (DSOF ¶ 77; PCSOF ¶ 38; PSAF ¶¶ 5–6.) Plaintiff cites to the EEO counselor's report of their meeting. That report, which references the October 4, 2016 LOR, shows that the LOR was the reason Plaintiff contacted the EEO counselor. (*See* Doc. 65-2 at 5 (framing Plaintiff's initial EEO claim as whether she was "discriminated against based on her sex (female) when, on October 4, 2016, she was issued a Written Reprimand by Resident Auditor John Sabga?").) Because the LOR was issued before Plaintiff made her initial EEO contact, no reasonable juror could conclude that the LOR was retaliation for the EEO contact. *See Villiarimo*, 281 F.3d at 1065 n.10 (stating a court need not draw unreasonable inference in favor of plaintiff at summary judgment); *Anderson*, 477 U.S. at 255.

**(n)**, **(p)–(r)**, **(v)–(w)**, and **(y)–(bb)**.

### 1. Prima Facie Case of Retaliation

#### a. Protected Activity

"An employee engages in protected activity when she opposes an employment practice that either violates Title VII or that the employee reasonably believes violates that law." *Westendorf v. W. Coast Contractors of Nev., Inc.*, 712 F.3d 417, 422 (9th Cir. 2013). Defendant acknowledges that Plaintiff's contact with an EEO counselor on October 4, 2016 was protected activity. (*See* Doc. 67 at 24.) Defendant argues **Claims (q)**, **(w)**, **(y)**, and **(z)** fail because they do not involve protected Title VII activity and because Plaintiff did not believe Defendant's actions violated an employment practice. (Doc. 67 at 25.) Defendant cites Plaintiff's testimony that: (1) Altemus denied her request for transfer in July 2017 (**Claim (q)**) because Altemus "did not like" her and "wanted [her] under his thumb," (DSOF ¶ 186; PCSOF ¶ 113); and (2) Altemus called Plaintiff after work hours, Altemus issued a negative performance review, and Sabga issued the proposed notice of removal (**Claims (w)**, **(y)**, and **(z)**) because she sent an office-wide email on December 14, 2017, in which she brought up events between her and Altemus dating back to 2014, (DSOF ¶¶ 240, 269–70, 273; PCSOF ¶¶ 165, 191–92).

In her Opposition, Plaintiff does not directly respond to this argument. Instead, Plaintiff argues "an escalating chain of materially adverse events . . . followed management's knowledge of Plaintiff's [initiation of] protected activity," on October 4, 2016. (Doc. 76 at 18.) The Court will analyze **Claims (q)**, **(w)**, **(y)**, and **(z)** with reference to the October 4, 2016, protected activity.[28]

---

[28] Plaintiff implies that her December 12, 2017 email threatening to file an EEO complaint after Altemus denied her leave/telework request was protected activity. (Doc. 76 at 19–20; PSAF ¶¶ 70–71.) The email said, "[b]ecause you're in violation of my rights to use my annual [leave] for something I have to do and is not a requirement to policy, I will be filing an EEO complaint." (Doc. 65-30 at 47.) But the email shows Plaintiff's threat rested on a belief that the denial violated leave policy, not on a Title VII violation or reasonable belief that Altemus discriminated against her. And Plaintiff does not dispute that auditors were required to attend staff conferences unless leave was approved before the conference was announced or due to an unforeseen emergency or urgent matter, (DSOF ¶¶ 228, 230; PCSOF ¶¶ 153, 155), or that the conference was announced before she requested leave. (DSOF ¶¶ 224–25; PSAF ¶¶ 67–68.) Because Plaintiff's email threat to file an EEO complaint was based on her beliefs about a leave policy, one she admits she violated, and

### b. Adverse Employment Actions

Title VII's "antiretaliation provision, unlike the [antidiscrimination] provision, is not limited to discriminatory actions that affect the terms and conditions of employment." *White*, 548 U.S. at 64. Thus, the scope of covered adverse employment actions is broader in the retaliation context. *See id.* at 67. Plaintiff "must show that a reasonable employee would have found the challenged action materially adverse," i.e., "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. Courts must consider the context in which the alleged retaliatory action occurred, but in general, trivial harms, "petty slights," and "minor annoyances" will not suffice. *See id.* at 68–69; *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (explaining that in the retaliation context adverse employment actions must be non-trivial, and providing as examples, "termination, dissemination of a negative employment reference, issuance of an undeserved negative performance review and refusal to consider for promotion"). Hurt feelings, embarrassment, and harm to reputation are similarly insufficient to establish a materially adverse employment action. *See Collins v. Spencer*, No. 17-CV-1723, 2020 WL 487419, at *12 (S.D. Cal. Jan. 30, 2020); *Pickard v. City of Tucson*, No. CV-16-00729, 2019 WL 1130095, at *7 (D. Ariz. Mar. 12, 2019).

**Claims (i)** and **(p)**, the alleged push in the hallway and denial of Plaintiff's use of SAS software, which the Court concluded were not adverse employment actions for purposes of Plaintiff's gender discrimination claims, also do not satisfy the materiality standard for adverse actions in the retaliation context. *See Muldrow*, 601 U.S. at 357–58 (citing *White*, 548 U.S. at 68) (explaining that adverse employment actions supporting retaliation claims must be materially adverse, i.e., they must cause significant harm).

Nor are **Claims (n)**, **(v)**, **(w)**, and **(aa)** adverse actions. In **Claim (n)**, Plaintiff alleges that in March 2017, Sabga disclosed information on Plaintiff's PIP to multiple other people at a supervisors' meeting. (DSOF ¶¶ 3, 141; PCSOF ¶ 81.) Plaintiff fails to explain how

not related to discrimination of any kind, the email threat to file a complaint does not constitute protected activity. *See Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988) (explaining that "the opposed conduct must fairly fall within the protection of Title VII").

such disclosure would have dissuaded a reasonable worker from making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. Moreover, hurt feelings, embarrassment, and harm to reputation are insufficient to establish a materially adverse employment action. *See Collins*, 2020 WL 487419, at *12; *Pickard v. City of Tucson*, No. CV-16-00729, 2019 WL 1130095, at *7 (D. Ariz. Mar. 12, 2019).

In **Claim (aa)**, Plaintiff asserts Sabga made harassing comments about her presence on the team and her future employment at a meeting in June 2019, after her return to the office following MSPB proceedings. (DSOF ¶ 285.) As support, Plaintiff cites her deposition testimony that Sabga said "finding a place back in [for] me was a challenge." (PCSOF ¶ 204 (citing Westling Dep. 234:14-236:8, Doc. 65-5 at 128–30.)[29] This statement does not constitute a materially adverse action, and it is not the type of statement that would dissuade a reasonable employee from engaging in protected activity.

Plaintiff was not entitled to take the leave at issue in **Claim (v)** under agency policy, and therefore no reasonable employee would have found the denial materially adverse. *See Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68; *Uche-Uwakwe v. Shinseki*, 972 F. Supp. 2d 1159, 1187–88 (C.D. Cal. 2013) (holding denial of request for leave was not an adverse employment action because no reasonable employee in the plaintiff's circumstances would have believed they would obtain leave under the employer's policy). As explained above, *see supra* note 28, "[a]uditors were required to attend staff conferences except for circumstances where leave had been approved prior to the announcement of the staff conference date or due to unforeseen emergencies or urgent matters," (DSOF ¶¶ 228, 230; PCSOF ¶¶ 153, 155), and the staff conference was announced a week before Plaintiff requested leave (for an appointment she made "over a month ago"), (DSOF ¶¶ 224–25; PSAF ¶¶ 67–68). Moreover, management attempted to accommodate Plaintiff and ultimately approved 3.5 hours of leave. (DSOF ¶¶ 226, 238; PCSOF ¶¶ 151, 163.)

---

[29] In PSAF ¶ 87, Plaintiff claims that Sabga also said, "we are starting fresh," "emotions are raw," and he did not know "what was going to happen." In support, Plaintiff cites her own deposition transcript. But these statements are not in the transcript. This inconsistency is discussed in detail in note 12, *supra*. Whether Sabga made these additional statements does not affect the Court's conclusion that **Claim (aa)** is not an adverse employment action.

In **Claim (w)**, Plaintiff alleges Altemus retaliated against her by calling her after work hours to informally counsel her despite her request to postpone the conversation. (DSOF ¶ 3.) Plaintiff now concedes that she did not request to postpone the conversation, Zadro first called during work hours, Plaintiff called back after hours, and in that call she agreed to management's offer to approve credit hours for the call. (DSOF ¶¶ 245, 248; PCSOF ¶¶ 170, 173.) Plaintiff does not explain how a call under such circumstances was materially adverse to her, and, by an objective, reasonable-employee standard, it was not.

In sum, **Claims (i)**, **(n)**, **(p)**, **(v)**, **(w)**, and **(aa)** are not independently actionable adverse employment actions.

### c. Causation

The causation element requires Plaintiff to establish her protected activity was a but-for cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *see also Westendorf*, 712 F.3d at 422 (applying but-for causation standard to Title VII retaliation claim before the Supreme Court's decision in *Nassar*).[30] Causation may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities, the temporal proximity between the protected activity and the allegedly retaliatory employment decision, and a pattern of antagonism following the protected activity. *See Yartzoff v. Thomas*, 809 F.3d 1371, 1376 (9th Cir. 1987); *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005). This inquiry into the motives of the employer is highly context-specific. *Porter*, 419 F.3d at 895 (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)).

Both parties blend their arguments regarding the causation element of Plaintiff's

---

[30] Before *Nassar*, Ninth Circuit caselaw was inconsistent on the causation standard for Title VII retaliation claims. *Compare Poland v. Chertoff*, 494 F.3d 1174, 1180 n.2 (9th Cir. 2007) ("At the prima facie stage of a retaliation case, '[t]he causal link element is construed broadly so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" (quoting *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001))), *with Villiarimo*, 281 F.3d at 1064–65 ("To establish causation [the plaintiff] must show 'by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [his] firing and that but for such activity [he] would not have been fired.'"). The Court relies on pre-*Nassar* caselaw to the extent its reasoning is consistent with the but-for causation standard.

prima facie case of retaliation and pretext at step three of the *McDonnell Douglas* framework. (*See* Doc. 67 at 24–29; Doc. 76 at 18–22.) Thus, the Court assumes without deciding that the remaining allegedly retaliatory actions—**Claims (j)**, **(k)**, **(l)**, **(m)**, **(q)**, **(r)**, **(y)**, **(z)**, and **(bb)**—satisfy causation at the prima facie stage and will address the parties' arguments regarding steps two and three in the legitimate non-discriminatory evidence and pretext analysis below.

## 2. Legitimate Nonretaliatory Reasons

Assuming Plaintiff has met her burden of establishing a prima facie case of retaliation with respect to **Claims (j)**, **(k)**, **(l)**, **(m)**, **(q)**, **(r)**, **(y)**, **(z)**, and **(bb)**, the burden shifts to Defendant "to show a non-retaliatory justification for the challenged action[s]." *See Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1021 (9th Cir. 2018). Defendant has met this burden.

With respect to **Claims (j)**, **(k)**, **(l)**, and **(m)**, Defendant asserts Plaintiff received an "Unacceptable" summary rating in her February 2017 performance review because over a period of months, her communication had become increasingly unprofessional, antagonistic, and sarcastic, she demonstrated a lack of teamwork, and these issues were interfering with other team members. (Doc. 67 at 27 (citing DSOF ¶¶ 115–24).) Under agency policy, the negative performance review required Plaintiff to have her telework suspended and to be placed on a PIP. (*Id.* (citing DSOF ¶¶ 125–26, 137–40).) Regarding Plaintiff's removal from the proposals team, Plaintiff's supervisor (Hehe) was promoted and transferred to another office, a temporary supervisor was to be assigned to Hehe's team, and Plaintiff was ultimately moved to Altemus's team to implement the PIP because she could not be supervised by a temporary supervisor while on a PIP. (*Id.* (citing DSOF ¶¶ 130–36).)

With respect to **Claim (q)**, Defendant asserts Altemus, Sabga, and Zadro denied Plaintiff's requests for transfers because: (1) she had just completed her PIP and they thought it was best for Plaintiff to remain under Altemus's supervision; (2) Plaintiff had a significant workload, which would create a difficult resource issue if she transferred

because another auditor would need to finish her work in progress; (3) other existing supervisors were in their first year as supervisors and Plaintiff had exhibited communications issues and argued with past supervisors and team members; (4) teams were already structured and Zadro, as the temporary Resident Auditor, did not want to reverse Sabga's team assignments while he was on leave; and (5) Sabga had not extended an office-wide invitation for auditors to choose their team assignments. (DSOF ¶¶ 173–84.)

With respect to **Claim (r)**, Defendant asserts Altemus did not recommend Plaintiff for a temporary supervisor position in July 2017 because she was not the best candidate: Plaintiff did not have the minimum "Fully Successful" rating on her most recent performance appraisal, four auditors had better performance appraisals than Plaintiff, and Plaintiff had just come off her PIP and was under a one-year observation period. (Doc. 67 at 27; DSOF ¶¶ 189–96.)

With respect to **Claims (y)** and **(z)**, Defendant asserts Plaintiff was issued a negative performance review and ultimately recommended for removal because of her well-documented poor behavior and communications issues. (Doc. 67 at 26 (citing DSOF ¶¶ 241–49, 256–67, 274–84).)

With respect to **Claim (bb)**, Defendant asserts Plaintiff's paycheck was delayed because Plaintiff's return to DCAA was a rushed action and there was confusion among those involved as to their responsibilities. The staffing team mistakenly treated Plaintiff as an employee returning to work instead of a new hire, and therefore, Plaintiff's information, including direct deposit and tax forms, was not properly processed. (Doc. 67 at 28 (citing DSOF ¶¶ 295–306).)

Plaintiff does not argue the legitimacy of these reasons; instead, she argues they are not the actual reasons for the adverse actions.

### 3. Pretext

Because Defendant articulated legitimate, nondiscriminatory reasons for the challenged actions, the burden shifts back to Plaintiff to show the asserted reasons are

merely a pretext for retaliation. *Kama v. Mayorkas*, 107 F.4th 1054, 1059 (9th Cir. 2024). Plaintiff can establish pretext by direct evidence that retaliation more likely than not motivated the employer, or circumstantial evidence showing the employer's explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or by a combination of these two kinds of evidence. *Id.* (quoting *Opara*, 57 F.4th at 723). At this stage, Plaintiff's burden remains low, but she still "must present some evidence that goes to the defendant's motivation—either by directly showing that it was discriminatory or by contesting the defendant's claimed motivation." *Id.* (citations omitted). Temporal proximity between the protected activity and the allegedly retaliatory action may support a showing of pretext, but the inquiry is fact-specific and depends on the degree of proximity and what, if any, other evidence supports the inference of pretext. *See id.* at 1059–60. Generally, some independent evidence of retaliation is present. *Id.* at 1060 (citations omitted).

Here, Plaintiff fails to show Defendant's stated reasons for the allegedly retaliatory actions are pretextual. As to **Claims (j), (k), (l), (m), (q), (r), (y), (z),** and **(bb)**, she offers no evidence Sabga, Hehe, Altemus, Coombs, and Zadro's explanations for their actions are inconsistent, irregular, lack credence or that the employees did not believe their explanations.[31] *See Villiarimo*, 281 F.3d at 1065 n.10. Plaintiff relies on the "escalating chain of materially adverse events that followed management's knowledge of Plaintiff's protected activity," and the "proximity and content of th[o]se actions." (Doc. 76 at 18–23.) But here the alleged pattern is not enough to show pretext. Plaintiff does not offer a single piece of independent evidence indicating either a retaliatory motive or that the employees' stated motives were not genuine. *See Yartzoff*, 809 F.3d at 1377 ("[A] grant of summary judgment [is] appropriate when evidence of discriminatory intent is totally lacking."). In the face of abundant and uncontroverted evidence that Defendant's actions were taken for legitimate reasons, Plaintiff's unsupported supposition is not enough to establish a genuine dispute of material fact. *See Uche-Uwakwe v. Shinseki*, 972 F. Supp. 2d at 1192 (citing

---

[31] The lack of evidence would also provide a basis for dismissal of Plaintiff's other retaliation claims—had they survived the prima facie stage.

*Reeves*, 530 U.S. at 148); *Kama*, 107 F.4th at 1059; (*see also, e.g.*, DSOF ¶ 186 (citing Plaintiff's deposition testimony that she believes Altemus denied her transfer requests because he "did not like [her]," and "just wanted [her] under his thumb")).

With respect to Plaintiff's removal from the proposals team (**Claim (l)**), Plaintiff challenges her supervisors' motive on the ground that Defendant does not cite a policy text that describes DCAA's policy that temporary supervisors cannot supervise employees who are on PIPs. (PCSOF ¶ 74 (partially disputing DSOF ¶ 134).) However, Plaintiff does not point to evidence that this was not in fact Agency policy or that Sabga did not believe it was. *See Kama*, 107 F.4th at 1059 ("When assessing the validity of an employer's stated reason for its actions, the key is not whether the reason is 'objectively false' or 'baseless' but whether the employer 'honestly believed its reasons for its actions.'" (quoting *Villiarimo*, 281 F.3d at 1063)). And Plaintiff does not dispute she needed to be transferred to another team because Hehe was promoted and transferred to another office, leaving her without a permanent supervisor. (DSOF ¶ 136; PCSOF ¶ 76.)

With respect to **Claims (j)**, **(k)**, and **(m)**, the February 2017 negative performance review and corresponding telework suspension and PIP placement, Plaintiff disputes the "truth and weight" of the examples of Plaintiff's behavior and communication issues Hehe cited as cause for the Unacceptable rating but does not cite any evidence supporting such a dispute. (PCSOF ¶¶ 62–65 (partially disputing DSOF ¶¶ 120–23).) Over a span of years, Plaintiff communicated with her coworkers and supervisors in ways they found inappropriate and abrasive. (*See, e.g.*, DSOF ¶¶ 65–72, 110, 115–23.) Sabga testified that there "has been no one else that has done anything remotely close to what Plaintiff did." (DSOF ¶ 110 (undisputed).) In that context, the timing of events and management's knowledge of Plaintiff's EEO activity do not show pretext.[32] *See Stepien v. Raimondo*, No.

---

[32] Sabga first learned of Plaintiff's EEO activity on October 31, 2016, and 105 days passed before Hehe completed the appraisal. (DSOF ¶ 104; PCSOF ¶ 54); *see Kama*, 107 F.4th at 1061 (holding supervisors' awareness of protected activity and 56 days between protected activity and adverse action insufficient to show pretext). Plaintiff does not allege when (or if) Hehe became aware of Plaintiff's EEO activity and appears to argue that Sabga, rather than Hehe, caused her performance review to be downgraded out of retaliation. (DSOF ¶ 107; PCSOF ¶¶ 55–57.)

21-CV-01410, 2024 WL 4043589, at *20 (W.D. Wash. Sept. 4, 2024) ("A complaint of discrimination does not grant an employee a free pass to engage in misconduct or insulate them from discipline for that misconduct."); *see also Kama*, 107 F.4th at 1062 (reasoning that supervisors' awareness of protected activity, in itself, is not persuasive evidence of pretext).

With respect to Claims **(q)** and **(r)**, Plaintiff points to her supervisors' "shifting rationales" to argue "[a] jury could reasonably view these multiple, inconsistent explanations as pretext." (Doc. 76 at 20–21.) But Defendant's explanations are not inconsistent. For example, although Plaintiff argues that the DCAA Personnel Management Manual does not include as a requirement for temporary supervisor positions that an employee have an "Exceeds Fully Successful" rating, she does not dispute that: (1) the Regional Audit Manager, Lisa Wieczorkowski, asked supervisors to recommend candidates whose last appraisal rating was "Exceeds Fully Successful"; and (2) Altemus recommended four auditors with higher performance appraisals than Plaintiff. (PCSOF ¶¶ 116–17, 122–23.) Plaintiff similarly fails to show that Defendant's explanations for denying her transfer requests in July 2017 are inconsistent. (Doc. 76 at 21; *see* DSOF ¶¶ 173–84.) And, having many legitimate reasons for an employment action does not automatically give rise to an inference of retaliatory motive. *See Kama*, 107 F.4th at 1059 ("[A] plaintiff must present some evidence that goes to the defendant's motivation."); (Doc. 67 at 26–27; DSOF ¶¶ 173–84).

With respect to **Claims (y)** and **(z)**, Plaintiff argues Defendant relies on inadmissible co-worker emails to justify the January 2018 performance review and February 2018 proposed removal. Plaintiff contends the emails cannot be credited over Plaintiff's admissible evidence. (Doc. 76 at 21.) The coworker emails are not inadmissible hearsay; they are not offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c)(2); (Doc. 97 at 9 n.11, 16). The emails describe Plaintiff's December 14, 2017 email as extremely offensive, threatening, inappropriate, and disturbing. (DSOF ¶ 242; PCSOF ¶ 167.) The emails are not meant to prove that Plaintiff's email was in fact offensive, inappropriate, or

disturbing, which are all subjective descriptors. Rather, the emails show the effect on the recipients of Plaintiff's email and her supervisors' awareness of her email's negative effect.

Importantly, Plaintiff does not meaningfully dispute Altemus and Sabga's non-retaliatory reasons for the performance review and proposed removal. Altemus's performance review detailed Plaintiff's significant decrease in cooperation, lack of support for DCAA core values, uncooperative and abrasive attitude in recent meetings, the inappropriate email sent to the entire office, failure to demonstrate an attitude of cooperation at the staff conference, and being uncooperative and disrespectful to her supervisor, including resisting the training planning process and a related defiant email. (DSOF ¶ 267.) Plaintiff does not dispute that the alleged misconduct occurred; she argues the conduct does not establish a failure to meet a standard, and instead, simply reflects disputed, subjective interpretations of interactions. (PCSOF ¶ 189.) That Plaintiff subjectively interprets her communications to be inoffensive does not raise a genuine dispute as to whether her supervisors honestly believed their reasons for taking disciplinary action. *See Kama*, 107 F.4th at 1059; *Brooks*, 229 F.3d at 928 (recognizing a Title VII complaint is not a "get out of jail free" card for employees engaged in job misconduct).

Plaintiff also argues the short time period between Plaintiff's December 12, 2017 threat to file an EEO complaint and the negative performance review and proposed removal is evidence of retaliatory motive. (Doc. 76 at 19–20.) As explained above, *see supra* Section IV.D.1.a., Plaintiff's threat to file a complaint for being denied a day of annual leave was not based on protected Title VII activity, and therefore its temporal proximity to the performance review and proposed removal is irrelevant. The applicable temporal proximity is to the initiation of EEO counseling in October 2016, approximately 15 to 16 months earlier, which is too long to raise an inference of retaliatory motive. *See Villiarimo*, 281 F.3d at 1065 ("A nearly 18-month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation.").

With respect to **Claim (bb)**, Plaintiff argues HR's handling errors "could have been retaliation" and whether HR personnel's actions were retaliatory "is a factual dispute for

the jury." (Doc. 76 at 22.) But again, Plaintiff does not dispute Defendant's explanation of what transpired, (*see* DSOF ¶¶ 294–307 (undisputed)), and she fails to cite evidence supporting her theory that HR delayed her paycheck out of retaliation, (*see* PCSOF ¶¶ 213–25). Plaintiff repeatedly cites to "PSAMF ¶¶B1–B6," which does not exist, (PCSOF ¶¶ 211–12, 214, 220, 226), and repeats Defendant's version of events in her own statement of additional material facts, acknowledging the "staffing team mistakenly processed" her return to work. (*See* PSAF ¶¶ 88–95.)

Plaintiff appears to rely solely on the timing of the delayed paycheck and Coombs's knowledge of Plaintiff's EEO activity to show pretext. (*See id.*) But the extent of Coombs's involvement in the delayed paycheck is unclear; Plaintiff acknowledges that several other employees and DCAA departments were involved in handling Plaintiff's paycheck and processing after reinstatement; and Plaintiff does not allege that anyone other than Coombs knew of Plaintiff's EEO activity. Even Plaintiff's deposition testimony does not support a dispute as to pretext. Plaintiff testified that she was "not accusing [Coombs] of anything malicious or anything illegal," or "tampering." (DSOF ¶¶ 308–09; PCSOF ¶¶ 226–27; Westling Dep. 239:1–20, Doc. 65-5 at 133.) Even assuming the relevant EEO activity is the conclusion of Plaintiff's MSPB case in May 2019, rather than the initiation of EEO activity in October 2016 or early 2018 (*see* DSOF ¶ 12), "temporal proximity cuts both ways" and is "not enough standing alone to establish pretext" in this context because the adverse action—the paycheck delay—followed on the heels of both the protected activity—the conclusion of the MSPB case—and the independent reason for the adverse action—Plaintiff's reinstatement, which required the Agency to reprocess Plaintiff's employment paperwork. *See Kama*, 107 F.4th at 1060 (explaining that "temporal proximity is less persuasive if it also supports a defendant's independent reason for an adverse action").

In sum, Plaintiff has not pointed to record evidence indicating that the alleged adverse actions were motivated by retaliation and that the actions would not have occurred but-for her protected activity. *See Nassar*, 570 U.S. at 362. No genuine dispute of material

fact exists, and Defendant is entitled to summary judgment on Plaintiff's retaliation claims.

### E. Title VII - Hostile Work Environment

Defendant argues Plaintiff's Complaint does not plead a hostile work environment claim, and even if it had, such a claim fails. (Doc. 67 at 29–30; Doc. 97 at 17–20.) Plaintiff argues no pleading defect exists because the Complaint alleges discrimination under Title VII and a hostile work environment is a form of discrimination covered by Title VII, no talismanic words are required to plead a claim under Rule 8, and Defendant had fair notice of her hostile work environment theory. (Doc. 76 at 13, 27.)[33] The Court need not reach this issue. Even assuming Plaintiff's Complaint properly pleaded a hostile work environment claim, Defendant is entitled to summary judgment on that claim.

"To prevail on a hostile workplace claim premised on . . . sex, a plaintiff must show: (1) that [s]he was subjected to verbal or physical conduct of a . . . sexual nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez*, 349 F.3d at 642 (citing *Gregory v. Widnall*, 153 F.3d 1071, 1074 (9th Cir. 1998)).[34] The third factor requires a showing of both subjective and objective hostility. *Okonowsky v. Garland*, 109 F.4th 1166, 1178–79 (9th Cir. 2024). The same elements, other than the sexual nature of the harassment, apply to hostile work environment claims based on a retaliatory motive. *See Ray v. Henderson*, 217 F.3d 1234, 1244–45 (9th Cir. 2000).

In analyzing the objective hostility of a working environment, the Court looks to the totality of circumstances to determine whether the plaintiff has adduced evidence of sufficiently severe or pervasive sexually offensive conduct from which a reasonable juror could conclude that the plaintiff's work environment was objectively hostile from the perspective of a reasonable woman. *Okonowsky*, 109 F.4th at 1179 (citing *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002), and *Clark Cnty. Sch. Dist.*

---

[33] Plaintiff does not cite legal authority in support of her argument.
[34] Cases analyzing racial harassment are also relevant to hostile work environment claims premised on sexual harassment or discrimination. *See Vasquez*, 349 F.3d at 642.

*v. Breeden*, 532 U.S. 268, 270–71 (2001) (per curiam)). Factors include: (a) the frequency and severity of discriminatory conduct, including its cumulative effect over time; (b) whether the conduct was physically threatening or humiliating; and (c) whether the conduct unreasonably interfered with the employee's work performance. *See id.* "[T]he 'required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.'" *Id.* (quoting *Davis*, 520 F.3d at 1095). "In all cases, 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' will not trigger Title VII's protections." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

Plaintiff alleges two instances of sexually offensive conduct: Sabga stared at her chest in an August 2015 meeting, and (2) Sabga pushed past her in the hallway knocking her into a wall on January 10, 2017. Crediting Plaintiff's version of events, these two isolated incidents, 17 months apart, are neither severe nor frequent enough to trigger Title VII's protections and did not alter the conditions of Plaintiff's employment. *See Okonowsky*, 109 F.4th at 1178–79. The addition of one instance of verbal harassment in June 2019,[35] roughly 29 months after the hallway push and four years after the chest staring, does not change the outcome. (*See* Doc. 76 at 25.) Plaintiff recites other factual allegations relating to her discrete claims of discrimination and retaliation, but none of those acts "are part of the same actionable hostile work environment practice" as the alleged physical and verbal harassment. *See Morgan*, 536 U.S. at 120.

To the extent Plaintiff alleges a retaliation-based hostile work environment practice, Plaintiff fails to allege what that practice is with any particularity or to explain how the various discrete acts are part of the same practice. (*See* Doc. 76 at 23–25.) Defendant's allegedly retaliatory conduct is also not sufficiently severe or pervasive. As explained in detail above, there is virtually no evidence of retaliatory motive. Primarily, Plaintiff was disciplined for misconduct which she does not dispute she engaged in. *Cf. Ray*, 217 F.3d

---

[35] The Court notes that Plaintiff does not argue Sabga's statements at the June 2019 meeting were gender-motivated or sexually offensive. (PCSOF ¶ 205.) The only statement Plaintiff identifies, that "finding a place back in [for] me [would be] a challenge," is not of a sexual nature. (PCSOF ¶¶ 206, 208, 210 (citing Westling Dep. 234:14–236:8, Doc. 65-5 at 127–30).)

at 1245–46 (holding hostile work environment-based retaliation claim survived summary judgment where plaintiff was targeted for verbal abuse related to those complaints for over one and a half years, subjected to a number of pranks, and falsely accused of misconduct).

**V.   Conclusion**

For the foregoing reasons, the Court concludes Defendant is entitled to summary judgment on Plaintiff's gender discrimination, disability discrimination, retaliation, and hostile work environment claims.

Accordingly,

**IT IS ORDERED:**

1.   Defendant Pete Hegseth's Rule 12(b)(1) Motion to Dismiss (Doc. 67) is **granted in part** with respect to claims for backpay.

2.   Defendant's Motion for Summary Judgment (Doc. 67) is **granted**.

3.   The Clerk of Court must enter judgment in favor of Defendant and against Plaintiff on all claims and close this case.

Dated this 16th day of July, 2026.

_____
Jennifer G. Zipps
Chief United States District Judge